UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/18/2025

------------------------------------------------------------------X
                                             :

In Re: BROOKFIELD INFRASTRUCTURE      :
PARTNERS L.P., et. al.                       :          25-mc-278 (LJL)
                                             :

------------------------------------------------------------------X     OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

        Petitioner the State of Peru ("Petitioner" or "Peru"), through the Ad Hoc Public Authority

for the Lava Jato case ("Ad Hoc Public Attorney"), petitions the Court for an order, pursuant to

28 U.S.C. § 1782, authorizing it to take discovery from Brookfield Asset Management Ltd.

("BAM"), Cahill Gordon & Reindel LLP ("Cahill"), KPMG LLP ("KPMG"), The Bank of Nova

Scotia, Scotia Capital (USA) Inc. ("Scotiabank"),[1] Arup Latin America S.A., Arup Americas,

Inc., Citibank, N.A., Wells Fargo, N.A., JP Morgan Chase & Co., The Clearing House Payments

Company L.L.C. ("CHIPS"), and the Federal Reserve Bank of New York ("Fed-NY")

(collectively "Respondents").  Dkt. No. 1.

        For the reasons that follow, the motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

        This is a follow-on motion to a proceeding to obtain discovery for use in a foreign

proceeding commenced in November 2024 in this Court by the Metropolitan Municipality of

Lima ("MML").  In that proceeding, MML sought an order permitting it to take discovery from

Brookfield Infrastructure Partners L.P., BAM and Brookfield Corporation (the "Brookfield

Entities"), as well as from the law firm Cahill and a number of banks including Scotia Capital

(USA) for use in one or more of four proceedings pending in Peru.  The Court originally granted

---

[1] Scotiabank includes The Bank of Nova Scotia, Scotia Capital (USA) Inc., and Scotia Holdings
(USA) LLC.  Dkt. No. 1.

MML's *ex parte* motion under Section 1782 but later vacated that order and quashed the subpoenas issued pursuant to that order. The Court found that MML was not an "interested party" to any of the proceedings, that one of the proceedings at issue was not a qualifying proceeding under Section 1782, and that two of the Brookfield Entities were not "found" in this District within the meaning of that statute. *See In re Brookfield Infrastructure Partners L.P.*, 2025 WL 1503942 (S.D.N.Y. May 27, 2025).[2] Peru filed this application in the wake of that decision.

## I.     The Underlying Dispute

The underlying dispute arises from a concession contract (the "Concession Contract") awarded by MML to a consortium of companies wholly owned by Odebrecht S.A. ("Odebrecht") for the construction, improvement, and maintenance of highways in Lima, the capital and largest city of Peru. MML is the local government authority for the Lima Metropolitan Area and the City of Lima. Odebrecht is a Brazilian global industrial conglomerate. On September 18, 2012, MML accepted a proposal submitted by Odebrecht and awarded the Concession Contract to the consortium, later incorporated as Rutas de Lima S.A.C. ("Rutas"). Dkt. No. 31-16 (Declaration of Richard Allemant, "Allemant Decl.") ¶ 5; *In re Brookfield Infrastructure Partners L.P.*, 2025 WL 1503942, at *1. Odebrecht was the majority shareholder of Rutas.

In 2016, Brookfield Infrastructure Group ("Brookfield Infrastructure"), an affiliate of a company then known as Brookfield Asset Management Inc., acquired a 57% stake in Rutas. Dkt. No. 32-3 ("2021 Vaughan Decl.") ¶¶ 2, 11. Brookfield was first presented with the opportunity for the controlling investment in Rutas in approximately March 2016 in connection

---

[2] On September 25, 2025, the Court denied a motion to reconsider that order. *In re Brookfield Infrastructure Partners L.P.*, Case No. 24-mc-00533 at Dkt. No. 89 (S.D.N.Y. filed Nov. 18, 2024).

with a competitive process run by Scotiabank.  *Id.* ¶¶ 24, 31.  After Brookfield completed its due diligence process and submitted a Final Binding Offer, Odebrecht awarded the bid to Brookfield, granting Brookfield the majority interest in Rutas.  *Id.* ¶¶ 31, 34.  The transaction closed in June 2016.  *Id.* ¶ 35.  Among the advisors that Brookfield engaged to conduct the due diligence process were Cahill and consultants KPMG Peru and KPMG Argentina.  *Id.* ¶¶ 31, 39, 4. Brookfield's interest in Rutas is held by a Peruvian closely held company called BIF III Peru Transportation I S.A.C. ("BIF III").  Dkt. No. 31-3 ("January 2025 Vaughan Decl.") ¶¶ 3, 12.

In 2015 Marcelo Odebrecht, Odebrecht's former CEO, was arrested and charged in Brazil with corruption; in March 2016, he was sentenced to 19 years in prison.  Dkt. No. 31-10 at 5; *In re Brookfield Infrastructure Partners L.P.*,  2025 WL 1503942, at *1.  In December 2016, Odebrecht entered into a plea agreement with the United States Department of Justice on charges that it paid bribes in connection with construction projects in various countries.  *In re Brookfield Infrastructure Partners L.P.*, 2025 WL 1503942, at *1.  In its plea with the Department of Justice, Odebrecht admitted to corruption in relation to four projects in Peru, however none of those projects was the Rutas concession.  *Id.*

Since 2018, Rutas and MML have been engaged in extensive arbitration proceedings in Washington, D.C. under the International Centre for Settlement of Investment Disputes ("ICSID").  Rutas has claimed that MML breached its obligations under the Concession Contract by failing to collect and then by suspending certain of the tolls that were intended to compensate Rutas for its construction work.  MML, in turn, alleged that the Concession Contract and related agreements were null and void because Odebrecht bribed local officials to secure the agreements. *See generally Metro. Municipality of Lima v. Rutas De Lima S.A.C.*, 141 F.4th 209, 212 (D.C. Cir. 2025).  Two separate arbitral tribunals ruled in Rutas' favor, finding the Concession

Contract valid and MML in breach, with two arbitration awards totaling $196 million. *Metro. Municipality of Lima v. Rutas De Lima S.A.C.*, 2024 WL 1071119, at *1 (D.D.C. Mar. 12, 2024), *aff'd*, 141 F.4th 209 (D.C. Cir. 2025). On June 24, 2025, the D.C. Circuit affirmed the confirmation of both arbitral awards against MML. 141 F.4th at 222. A third tribunal preliminarily found for Rutas before MML initiated a criminal investigation against the arbitral panel for bias. *Id.*

## II.    The Foreign Proceedings

In Peru, four criminal proceedings are pending or contemplated relating to Rutas and the Concession Contract (the "Foreign Proceedings"). Peru seeks Section 1782 discovery in connection with each of them.

In general, under Peruvian law, criminal proceedings have four stages: (i) the preliminary investigation stage, (ii) the preparatory investigation stage, (iii) the accusation or intermediate stage, and (iv) trial. Allemant Decl. ¶ 8; Dkt. No. 38 ("Carrion Decl.") ¶¶ 4–6. There are multiple participants in these proceedings. The fiscal, or Public Prosecutor's Office, leads the investigation and prosecution of criminal offenses. Allemant Decl. ¶ 7; Carrion Decl. ¶ 4. The procurador represents the state's legal and financial interests, and where they represent a public entity, are appointed by the Office of the Attorney General of the Republic. Allemant Decl. ¶ 7. An aggrieved party is "[a]nyone who is directly offended by the crime or harmed by the consequences thereof," including a government entity. Dkt. No. 6 ("Caro Decl.") ¶ 9; Allemant Decl. ¶ 7. Aggrieved parties have participation rights in criminal investigations, including the right to submit evidence, right to request that the fiscal gather specific evidence, and the right to participate in hearings. Caro Decl. ¶ 9. Lastly, there can also be a civil actor, who is someone harmed by the crime who can file a civil action for damages within the criminal proceedings. Dkt. No. 32-1 (Declaration of Jose Luis Velarde, "Velarde Decl.") ¶ 3(a). A civil actor has the

right to seek civil reparations (damages), to submit evidence, to cooperate in clarifying the

criminal act and identifying perpetrator(s) of the crime, to seek the nullity of procedural actions,

to participate in the investigation, to participate in the oral trial, to file appeals, and to intervene

in proceedings involving restrictive measures of rights.  Caro Decl. ¶ 10.

The first stage, the preliminary investigation, is initiated by the fiscal either *sua sponte* or

in response to the filing of a complaint, based upon a showing of "simple suspicion."  Allemant

Decl. ¶ 9.  If, during the preliminary investigation, the fiscal finds that there exists "revealing

suspicion" that a crime has been committed, the case progresses to the preparatory investigation

stage, where it is presented to a tribunal and a judge.  *Id.* ¶ 12.  In that stage, the judge acts as a

neutral adjudicator.  *Id.* ¶ 12.  If, at the end of the preparatory stage, the fiscal chooses to dismiss

the case, its decision can be appealed by an aggrieved party or the procurador.  *Id.* ¶ 12.  If the

case is not dismissed, it moves to the accusation stage.  *Id.* ¶¶ 12, 14.  At the accusation stage,

the fiscal presents the formal charges and relevant evidence to a judge with a request for trial and

the judge decides whether the formal accusation meets legal standards and is supported by the

facts.  *Id.* ¶ 14.  If the judge so finds, the case progresses to a trial with a "beyond a reasonable

doubt" burden of proof.  *Id.* ¶¶ 15–16.

The Foreign Proceedings are at different stages of the Peruvian criminal process.  All

four proceedings were initiated by a specialized fiscal, the Ad Hoc Prosecutor's Office, due to

their association with the Odebrecht Lava Jato investigations.  Dkt. No. 31-5 (Declaration of

Renzo Carrasco Domhoff, "Carrasco Decl.") ¶ 6.

### A.    The "Villarán Bribery Case" (30-2017)

The "Villarán Bribery Case" (30-2017) was initiated on November 24, 2017 and is at the

trial stage.  Carrion Decl. ¶ 6.  That case involves charges of bribery-related crimes and money

laundering committed by the former Mayor of Lima Susana Villarán, who granted the

Concession Contract to Odebrecht, other MML officials, and an Odebrecht executive. Allemant Decl. ¶ 22; Carrasco Decl. ¶¶ 19, 22–24. Villarán is alleged to have solicited approximately US $3 million in improper payments from Odebrecht in connection with the Concession Contract. Allemant Decl. ¶ 22.

The Villarán Bribery Case is proceeding to trial after a judge found that the requisite evidentiary burden was met. Carrasco Decl. ¶¶ 21–22; Allemant Decl. ¶ 16. The charges are criminal association, collusion, bribery, incompatible negotiation, crimes against public faith, and money laundering. Caro Decl. ¶ 12; Allemant Decl. ¶ 23; Carrasco Decl. ¶¶ 5, 22.

### B.    The "Rutas Money Laundering Case" (31-2017)

On December 7, 2017, the Ad Hoc Prosecutor's Office initiated an investigation of former Peruvian president Pedro Pablo Kuczynski and several others for money laundering related to Rutas' payment to Rutas' purported financial advisor, Gerardo Sepulveda, of an illegal "success fee" of US $3.5 million upon the financial closing of the Concession Contract. Caro Decl. ¶ 13; Allemant Decl. ¶ 24. The accused are Kuczynski, Sepulveda, Gloria Jesus Kisic Wagner, and Jose Luis Bernaola Nufflo. Carrasco Decl. ¶ 5.

The Rutas Money Laundering case is in the accusation stage. Vega Decl. ¶ 13; Allemant Decl. ¶ 24; Carrasco Decl. ¶ 18–20. The charge is money laundering with aggravating circumstances. Allemant Decl. ¶ 25; Carrasco Decl. ¶ 5.

### C.    The "Concession Contract Corruption Case" (448-2017)

In late 2017, the Ad Hoc Prosecutor's Office initiated an investigation into former Mayor Villarán and other individuals relating to the Concession Contract between Rutas and MML, covering the potential overvaluation of construction works, unjustified modifications to

mandatory projects, improper toll rate increases, and the implementation of compensation mechanisms.  Allemant Decl. ¶ 27.[3]

The Concession Contract Corruption Case moved from the preliminary investigation stage to the preparatory investigation stage in September 2018 and continues in the preparatory stage.  Caro Decl. ¶ 14; Allemant Decl. ¶ 27.  The charges are aggravated collusion, criminal association, and incompatible negotiation.  Allemant Decl. ¶ 27; Carrasco Decl. ¶ 29.

### D.    The Brookfield Money Laundering Investigation (29-2023)

The proceeding that is the least progressed is the Brookfield Money Laundering Investigation.  On August 8, 2023, the Ad Hoc Prosecutor's Office initiated a preliminary investigation of alleged money laundering by those responsible for Brookfield Infrastructure, following the submission of a criminal complaint by MML.  Dkt. No. 31-10;  Allemant Decl. ¶ 18; Carrasco Decl. ¶¶ 5, 10–11; 2021 Vaughan Decl. ¶ 2.  The Brookfield Money Laundering Investigation examines the circumstances under which Brookfield Infrastructure acquired a majority stake in Rutas in 2016, including whether the acquisition involved inadequate due diligence on Brookfield's behalf in purchasing Odebrecht's majority stake in Rutas, whether in doing so Brookfield Infrastructure violated its own ethical codes or anti-corruption policies, and whether Odebrecht has continued to exercise control over Rutas after selling its interest. Allemant Decl. ¶¶ 18–20.

---

[3] The accused in the Concession Contract Corruption Case are Villarán, Domingo Arzubialde Elorrieta, Juan Andrés Ramos Arapa, Carlos Fernando Steiert Goicochea, Juan José Neyra Montes, Miguel Alfredo Flores Dueñas, Daniela Canales Hernández, Norma Ana Montoya Blua, Lucio Alva Matteucci, Jaime Villafuerte Quiróz, María Del Pilar Márquez Mares Ramos, Elizabeth Vilca Quispe, María Del Rosario Solís Martínez, Guillermo Segundo Gonzales Criollo, Alfieri Bruno Lucchetti Rodríguez, Liliana Martina Orozco Pinto-Bazurco, Demetrio Rojas García, and Raúl Javier Bueno Cano.  Allemant Decl. ¶ 27.

This proceeding has not advanced beyond the preliminary investigation stage and has therefore yet to be presented to a tribunal. *Id.* ¶ 21; Carrasco Decl. ¶¶ 10–15. The fiscal extended the deadline for the investigation to August 28, 2026. Caro Decl. ¶ 15.

### III.    The Prior Proceeding

On November 18, 2024, MML filed a motion in this Court under 28 U.S.C. § 1782 to obtain discovery to use in the Foreign Proceedings. *In re Brookfield Infrastructure Partners L.P.*, Case No. 24-mc-00533 at Dkt. No. 1 (S.D.N.Y. filed Nov. 18, 2024) ("*BIP*"). The discovery targets included the Brookfield Entities, Scotiabank US, and Cahill. The Court initially granted MML's motion *ex parte* and without prejudice to potential reconsideration of the application of the Section 1782 factors. *BIP* Dkt. No. 12.

Following the issuance of the Section 1782 order in that case, the Brookfield Entities, Scotiabank and Cahill filed motions to vacate that order and the subpoenas issued pursuant to it. *BIP* Dkt. Nos. 32, 38, 44.

On May 27, 2025, the Court granted those motions and vacated the Section 1782 order and the subpoenas issued under it. *BIP* Dkt. No. 72; 2025 WL 1503942 (S.D.N.Y. May 27, 2025). The Court concluded that MML was not an "interested person" within the meaning of Section 1782 because it was not an aggrieved party in any of the Foreign Proceedings and thus did not have the right to submit evidence in connection with any of those proceedings and to have that evidence considered. 2025 WL 1503942, at *6–9. It also did not have a relationship, such as that between principal and agent, with a party which had the right to submit evidence. *Id.* The Court also concluded that the Brookfield Money Laundering Investigation was not a qualified foreign proceeding under Section 1782 because the proceeding itself was not before an impartial adjudicator or judge and no proceeding before a judge was in reasonable

contemplation.  *Id.* at *11–12.  Finally, the Court concluded that certain of the discovery subjects were not "found" in this District to permit Section 1782 discovery.  *Id.* at *14–16.[4]

### IV.    The Deputy Ad Hoc Public Attorney

This action was filed on June 25, 2025 by Peru through the Ad Hoc Public Attorney for the Lava Jato Case.  Dkt. Nos. 1, 6.  Peru, as represented by the Ad Hoc Public Attorney, has been designated an aggrieved party and a civil actor in the Villarán Bribery Case, Caro Decl. ¶ 12, in the Rutas Money Laundering Case, *id.* ¶ 13, and in the Concession Contract Case, *id.* ¶ 14, and is an aggrieved party in the Brookfield Group Money Laundering Case, *id.* ¶ 15.

### V.    Discovery Sought

By this application, Peru seeks to serve subpoenas for documents on BAM, Cahill, KPMG, Scotiabank, Arup, Citibank, N.A., Wells Fargo, N.A, JPMorgan Chase & Co, CHIPS, and FED-NY and a subpoena for testimony on BAM.  In general, the subpoenas seek due diligence materials, financial records, and banking documents related to the Concession Contract and the acquisition of Rutas.  Caro Decl. ¶ 16.  BAM, Cahill, and Scotiabank have objected to the Section 1782 application.  The other targets have not.  The Court describes the discovery requested of BAM, Scotiabank, and Cahill, as applicable, in each of the sections below addressed to the discovery requests directed to that target.

### PROCEDURAL HISTORY

Peru filed this motion on June 25, 2025.  Dkt. No. 1.  It also filed a memorandum of law and two declarations in support of the motion.  Dkt. Nos. 4–6.  On June 27, 2025, Peru filed a corrected declaration of Scott Curtis Nielson.  Dkt. No. 9.

---

[4] On June 10, 2025, MML moved for reconsideration of the Court's order in the Prior Proceedings.  *BIP* Dkt. No. 73. By separate order, the Court has denied that motion.  *BIP* Dkt. No. 89.

On July 29, 2025, memoranda of law in opposition to the motion were filed by BAM, Cahjill, and Scotiabank. Dkt. Nos. 23, 30, 33. BAM filed the declaration of Benjamin Vaughan in support of its opposition to the motion. Dkt. No. 24. Scotiabank filed the declarations of David G. Hille and David M. Howard in support of its opposition to the motion. Dkt. Nos. 31–32. Cahill filed the declaration of Ivan Torres in support of its opposition to the motion. Dkt. No. 34.

On August 12, 2025, Peru filed a reply memorandum of law in further support of its motion. Dkt. No. 35. It also filed the declarations of Scott Curtis Nielson, Kevin Andre Silva Carillo, and Silvana America Carrion Ordinola. Dkt, Nos. 36–38. On September 11, 2025, Peru wrote the Court to inform it of imminent developments in the foreign proceedings that formed the basis of its request. Dkt. No. 39. On September 22, 2025, Scotiabank filed the Declaration of David M. Howard, attaching the Supplemental Declaration of Jose Luis Velarde, as filed in *Brookfield Infrastructure Partners L.P.*, 24-mc-533 Dkt. No. 61 (S.D.N.Y.). Dkt. No. 48. The Court heard oral argument on September 23, 2025. Minute Entry for Sept. 23, 2025.

## DISCUSSION

The standards that a Section 1782 applicant must satisfy is well-trodden ground.

"The analysis of a district court hearing an application for discovery pursuant to § 1782 proceeds in two steps." *Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*, 27 F.4th 136, 148 (2d Cir. 2022).

First, to be entitled to relief under Section 1782, applicants "must meet several statutory requirements, including that '(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign [or international] tribunal, and (3) the application is made by a foreign or international tribunal or any interested person.'" *Mangouras v. Squire Patton*

*Boggs*, 980 F.3d 88, 97 (2d Cir. 2020) (quoting *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir.

2015)); *see In Re BonSens.org*, 95 F.4th 75, 79 (2d Cir. 2024).[5]  Those standards are mandatory.

Second, "[o]nce the statutory requirements are met, a district court may order discovery

under § 1782 in its discretion, taking into consideration the 'twin aims' of the statute, namely,

'providing efficient means of assistance to participants in international litigation in our federal

courts and encouraging foreign countries by example to provide similar means of assistance to

our courts.'"  *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 117

(2d Cir. 2015) (quoting *In re Metallgesellschaft*, 121 F.3d 77, 79 (2d Cir. 1997)); *see In re Pub.*

*Joint-Stock Co. Bank Otkritie Fin. Corp.*, 2023 WL 4928227, at *2 (S.D.N.Y. Aug. 2, 2023).  If

an application fails on the statutory requirements, however, the district court need not evaluate

the discretionary factors.  *See BonSens*, 95 F.4th at 81–82 ("Having concluded that the district

court did not err in determining that the 'for use' prerequisite was not met, we can identify no

abuse of discretion in the district court's decision to forgo consideration of the *Intel* factors.").

## I.    The Statutory Factors Are Satisfied Except for the Brookfield Money Laundering Investigation

The Court starts with the statutory factors before addressing the *Intel* discretionary factors

with respect to each of the Respondents.

### A.    Interested Person

Peru is an interested person.  Its application does not suffer from the same defect that

doomed MML's application in the Prior Proceeding.

Section 1782 permits applications by a "foreign or international tribunal" or an

"interested person" in the foreign proceeding.  28 U.S.C. § 1782. The term "interested person"

---

[5] Additionally, as discussed below, the statute requires that the discovery not be "in violation of any legally applicable privilege." 28 U.S.C. § 1782(a); *see In re Guo*, 965 F.3d 96, 102 n.3 (2d Cir. 2020).

plainly includes litigants. *See Intel Corp. v. Advanced Micro Devices, Inc*, 542 U.S. 241, 256 (2004). It also includes other persons who "possess a reasonable interest in obtaining the assistance" or who have "a significant role in the process." *Id.* (internal quotations and citations omitted).

In its order in the Prior Proceeding, the Court laid out the standards that a person who is not a litigant in the foreign proceeding must establish to be an "interested person." Those standards were stated in *Certain Funds*, 798 F.3d at 119. A person who is otherwise a stranger to the proceeding may be an interested person if she has "an established *right* to provide evidence and have the party consider it, . . . or a recognized relationship, such as that of an agent and principal." *Id.* at 120. The "interested person" requirement might be satisfied where "the relevant jurisdiction's law" gives the applicant the right "to participate and submit evidence in the proceeding." *Id.* However, "the ability simply to pass on information to parties in a proceeding, without more, cannot confer 'interested person' status any more than the ability of *amicus* counsel to pass along evidence and arguments to counsel representing one of the parties in litigation." *Id.* MML did not satisfy that standard. Peru, acting through the Ad Hoc Public Attorney, indisputably does.

On February 6, 2017, the Peruvian State appointed an Ad Hoc Public Attorney to represent the State and to exercise the legal defense of the rights and interests of the Peruvian State before jurisdictional and non-jurisdictional bodies, national and international, in investigations and proceedings related to crimes of corruption of officials, money laundering, and other related crimes related to Odebrecht. Caro Decl. ¶ 8. As such, it has the responsibility to defend the legal and patrimonial interests of the Peruvian State. *Id.* Under Peruvian legislation, "Ad Hoc" public attorneys "assume the legal defense of the State in special and

transcendent cases." *Id.* The State of Peru, as represented by the Ad Hoc Public Attorney, is an aggrieved party and a civil actor in the Villarán Bribery Case, *id.* ¶ 12, in the Rutas Money Laundering Case, *id.* ¶ 13, and in the Concession Contract Corruption Case, *id.* ¶ 14, and is an aggrieved party in the Brookfield Group Money Laundering Case, *id.* ¶ 15. Although the fiscal or public prosecutor is responsible for initiating investigations and prosecuting criminal offenses on behalf of society as a whole and is considered to be disinterested, *id.* ¶ 7; Transcript of Oral Argument, September 22, 2025 ("Tr.") at 6:20–23, the Ad Hoc public attorney, the *procurador*, represents the State of Peru and Peru's interest in receiving compensation as a civil actor and in exercising the right to submit evidence as an aggrieved party, Tr. 6:24–7:4.

Peru, acting through the Ad Hoc Public Attorney, is an interested person. It has the right to submit evidence in connection with all four proceedings and has the right to seek civil damages in all of the Foreign Proceedings except for in the Brookfield Money Laundering Investigation. *See, e.g.*, *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017) (a person is an interested person if it has "the procedural right to submit the requested documents to the magistrate overseeing the investigation"); *In re B&C Holding GmbH*, 2023 WL 1777326, at *3 (S.D.N.Y. Feb. 6, 2023) (victim with right to submit evidence to the prosecutors is an interested person); *In re Vinmar Overseas, Ltd.*, 2020 WL 4676652, at *2 (S.D.N.Y. Aug. 12, 2020) (victim and complainant with "substantial participation rights" is an interested person) (citing cases).

## B.    Respondents and the Discovery Targets Are "Found" in this District

Section 1782 discovery may only be sought from a federal district court in "the district in which a person resides or is found." 28 U.S.C § 1782. The Second Circuit has held that the "found" requirement of Section 1782 should be "'interpreted broadly,' especially given the district court's ability 'to exercise discretion in deciding whether, and in what manner, to order

discovery in particular cases.'"  *In re del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019) (quoting *In re Edelman*, 295 F.3d 171, 180 (2d Cir. 2002)).  Section "1782's 'resides or is found' language extends to the limits of personal jurisdiction consistent with due process."  *Id.*

BAM, Cahill and Scotiabank do not dispute that the Court has general jurisdiction over them.  Petitioner thus has satisfied the "found" requirement.

### C.    For Use In A Foreign Proceeding

BAM, Scotiabank, and Cahill do not dispute that the evidence being sought satisfies the "for use" requirement of Section 1782 with respect to at least the "Villarán Bribery Case" (30-2017), the "Rutas Money Laundering Case" (31-2017), and the "Concession Contract Corruption Case" (448-2017).  They contend, however, that Peru does not satisfy the "for use" requirement with respect to the "Brookfield Money Laundering Investigation" (29-2023).  Dkt. No. 23 at 16–17.  Their argument is well-founded.

"The 'for use' statutory prerequisite assesses 'the *practical ability* of an applicant to place a beneficial document—or the information it contains—before a foreign tribunal.'"  *BonSens*, 95 F.4th at 80 (quoting *In re Accent Delight Int'l Ltd.*, 869 F.3d at 131).  It can be understood to embody two separate components.  First, the evidence being sought must be "minimally relevant to the foreign proceeding" and there must be some "procedural mechanism" by which it may be used in the foreign proceeding.  *BonSens*, 95 F.4th at 80.  Second, the body before which the evidence is to be presented must count as a foreign or international tribunal.  *See ZF Auto. US, Inc. v. Luxshare, Ltd.*, 596 U.S. 619 (2022).  "The statute reaches only governmental or intergovernmental adjudicative bodies."  *Id.* at 623.  "[I]n order to satisfy the second statutory requirement, the applicant must seek discovery for use in an 'adjudicative' proceeding."  *Fed. Republic of Nigeria*, 27 F.4th at 148.

"While Section 1782's 'for use' prong explicitly contemplates that the 'proceeding' in question may be a 'criminal investigation[],' the statutory text just as explicitly requires that the criminal investigation be one before 'a foreign or international *tribunal*.'" *Matter of Application for an Order Seeking Discovery Under 28 U.S.C . § 1782*, 2024 WL 2883293, at *4 (S.D.N.Y. May 16, 2024) (quoting 28 U.S.C. § 1782(a)). Thus, to "serve as a proper predicate for a § 1782 petition" the proceeding for which the discovery is sought must be "adjudicative in nature." *Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24, 27 (2d Cir. 1998). Courts have found proceedings to be nonadjudicative when the form of the proceeding is "inconsistent with the concept of impartial adjudication." *Fonseca v. Blumenthal*, 620 F.2d 322, 324 (2d Cir. 1980); *see In re Letters Rogatory Issued by Dir. of Inspection of Gov't of India*, 385 F.2d 1017, 1021 (2d Cir. 1967) (Friendly, J.) (stating that the concept of adjudication "is not so broad as to include all the plethora of administrators whose decisions affect private parties and who are not entitled to act arbitrarily, and one useful guideline is the absence of any degree of separation between the prosecutorial and adjudicative functions"). But when a proceeding involves a judge deciding contested legal or factual issues, it is generally understood to be adjudicative. *See Fed. Republic of Nigeria*, 27 F.4th at 158 ("determin[ing] the merits of a contention that an arbitral award should be vacated as fraudulently obtained, a recognized judicial function in this country as well as in the United Kingdom," is adjudicative); *In re YS GM Marfin II LLC*, 2022 WL 624291, at *6 (S.D.N.Y. Mar. 2, 2022) ("[T]he contemplated proceedings . . . will not be merely 'administrative,' as they will involve a court hearing or judicial review of a TPDO application."); *In re China Constr. Bank (Asia) Corp. Ltd.*, 2023 WL 3791711, at *1 (S.D.N.Y. June 2, 2023) ("the debtor examination will involve judicial factfinding," and is therefore adjudicative). Thus, for example, Section 1782 "applies to a foreign criminal investigation involving an investigating

magistrate seeking documents in the United States." *In re Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings*, 773 F.3d 456, 458 (2d Cir. 2014). If a qualifying foreign or international proceeding is not pending, the applicant must show that it is at least within "reasonable contemplation." *Intel*, 542 U.S. at 259.

In the Prior Proceeding, the Court found that the Brookfield Money Laundering Investigation was not currently a qualifying foreign proceeding and that no qualifying foreign proceeding was within reasonable contemplation. The Court reasoned that the Brookfield Money Laundering Investigation was in its preliminary investigation stage without an assignment to a judge and that the Ad Hoc Prosecutor's Office was "not akin to 'an investigating magistrate or similar neutral adjudicator." *In re Brookfield Infrastructure Partners L.P.*, 2025 WL 1503942, at *11 (quoting *In re Application for an Ord. Seeking Discovery Under 28 U.S.C. § 1782*, 2024 WL 2883293, at *4–5 (S.D.N.Y. May 16. 2024)). The Court also held that a proceeding in the preparatory investigation stage, which would be a proceeding before a foreign tribunal, was not "within reasonable contemplation" because the initiation of such proceeding was within the control of the Ad Hoc Prosecutor and MML had not offered any objective evidence that a decision would be made to move the case to the preparatory stage before a qualifying tribunal or that such decision would be made "within a reasonable time." *In re Brookfield Infrastructure Partners L.P.*, 2025 WL 1503942, at *12.

Peru has not identified any facts that would alter the Court's prior decision. The Ad Hoc Public Attorney, like MML, has no authority to commence a criminal proceeding or to move it to the accusation stage. Accordingly, Peru "must 'provide an objective basis on which to conclude'" that the Public Prosecutor will commence a criminal proceeding. *BonSens*, 95 F.4th at 80–81 (quoting *IJK Palm*, 33 F.4th 669, 680 (2d Cir. 2022)). "The mere opportunity to

present material to a party to a potential future lawsuit does not satisfy the requirement of § 1782 that the material be 'for use' in a foreign proceeding." *IJK Palm*, 33 F.4th at 678.  Peru relies upon Provision No. 7 from the Public Prosecutor's Office in February 2024 to argue that the Public Prosecutor will commence a criminal proceeding.  Dkt. No. 4 at 15; Carrasco Decl. ¶ 17 n.18; *BIP* Dkt. No. 39-10.  That document states, in part, that the investigation of the offense intended to bring criminal proceedings is carried out by the Public Prosecutor's Office.  *BIP* Dkt. No. 39-10 § 2.1  It also lays out the facts to be investigated and theories of liability.  *Id.* at § 4.  Peru also relies upon Disposition No. 13 of the National Prosecutor's Office, which is dated February 12, 2025.  Dkt. No. 5-14.

The facts identified by Peru do not materially differ from those before the Court in May 2025 when the Court concluded in the Prior Proceeding that a criminal proceeding was not reasonably contemplated.  Provision No. 7 reflects the decision of the prosecutor to "initiate preliminary proceedings" to determine whether the crime of money laundering was committed. *BIP* Dkt. No. 39-10 Art. I.  The section of the Provision to which Peru points does not contain any facts from which the Court can conclude that the investigation may continue past its preliminary stage.  It states that such office has decided to conduct "the relevant investigative acts," keeping in mind among other things its duties "as the guarantor of the rights of the accused."  *Id.* § 2.1.  The other paragraphs cited by Peru summarize the complaint made to the prosecutor by the MML.  *Id.* at §§ 3–4.  The prosecutor does not adopt that complaint as its own.  All of that information was before the Court in May 2025; it establishes no more than that the prosecutor is conducting an investigation.  Disposition No. 13 is new, but it does not provide any objective basis to conclude that the investigation will progress beyond the investigative stage.  It states that the investigation has been expended to included BIF III "as the legal entity under

investigation for the facts denounced." Dkt. No. 5-14 at 8.  It also contains a lengthy list of witnesses from BIF III to be interviewed.  *Id.* at 8–13.  Those interviews presumably are being conducted to determine whether there is a "revealing suspicion" that BIF III has committed the money laundering crimes of which it has been accused.  They do not provide any objective indication that the evidence will meet that higher standard which must be satisfied before the evidence is presented to a judge.

Peru argues that "[w]hen concrete preparatory steps . . . are present, court treat timelines [such as that in the Money Laundering Investigation] as within 'reasonable contemplation' for purposes of § 1782."  Dkt. No. 4 at 16.  The question in this case, however, is not whether a proceeding for which there is evidence and a legal theory would be commenced "within a reasonable time."  *In re Brookfield Infrastructure Partners L.P.*, 2025 WL 1503942, at *12.  It is whether there is any evidence or anything more than a subjective desire by Peru that a proceeding be commenced at any time, *i.e.* whether such a proceeding "is more than just a twinkle in counsel's eye."  *Certain Funds*, 798 F.3d at 123.  In each of the cases cited by Petitioner, the applicant (1) had the unilateral ability to initiate a proceeding; (2) demonstrated that there was a theory and evidence upon which a proceeding could be initiated; and (3) had taken steps to initiate a proceeding.  *See In re Mutabagani*, 2023 WL 2811621, at *3 (S.D.N.Y. Apr. 6, 2023) (applicant had information within its possession to support a claim, described the legal theory on which it planned to rely, and showed how it intended to use the requested discovery); *In re Iraq Telecom Ltd.*, 2023 WL 2402873, at *5 (E.D. Pa. Mar. 8, 2023) (applicant identified its theory of litigation, had retained counsel to initiate the foreign proceeding, and had conducted significant investigation to support the claim); *Bravo Express Corp. v. Total Petrochemicals & Ref. U.S.*, 613 F. App'x 319, 323 (5th Cir. 2015) (applicant laid out "in great

detail" the fact that would give rise to the prospective lawsuit and averred that foreign proceeding would be "imminently filed"). In this case, not only does Peru not have the ability to initiate a proceeding, it has also not provided the Court any objective basis upon which the Court can conclude that the Public Prosecutor's Office will commence a proceeding.

## II.    The Application is Denied As to Documents Subject to Legally Applicable Privilege

Section 1782 prescribes: "A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." 28 U.S.C. § 1782(a); *see United States v. Zubaydah*, 595 U.S. 195, 202 (2022). "This 'mandatory requirement[ ]' that discovery not violate a properly invoked privilege must be 'satisfied' before the Court can consider whether or not to 'grant the application in its discretion.'" *In re Pilant*, 2025 WL 2673883, at *2 (E.D.N.Y. Sept. 18, 2025) (quoting *Mangouras*, 980 F.3d at 97). "When a party asserts a privilege against a Section 1782 subpoena, 'the burden is on the person who claims the privilege to show entitlement.'" *In re Genial Institucional Corretora de Cambio, Titulos e Valores Mobiliarios S.A.*, 2025 WL 40783, at *6 (S.D.N.Y. Jan. 7, 2025) (quoting *Chevron Corp. v. Berlinger*, 629 F.3d 297, 309 (2d Cir. 2011)). Scotiabank argues that the subpoena directed to it would require it to produce documents protected by privilege. Dkt. No. 30 at 14. Specifically, Scotiabank argues that the subpoena targets information that is protected by the privilege for suspicious activity reports under both United States and Peruvian law and targets information that is protected by principles of Peruvian bank secrecy. *Id.* at 13–15.

"The Second Circuit has long recognized that parties may invoke foreign law as a 'legally applicable privilege' under Section 1782." *In re BM Brazil 1 Fundo de Investimento em Participações Multistratégia*, 347 F.R.D. 1, 8 (S.D.N.Y. 2024) (citing *In re Erato*, 2 F.3d 11, 14

(2d Cir. 1993)).  Where competing national privilege laws produce different results, "courts should first conduct a choice-of-law analysis to determine which body of privilege law applies." *Mangouras*, 980 F.3d at 98.  The Second Circuit has established "the 'touch base' test [as] the proper choice-of-law test for purposes of determining which privileges are 'legally applicable' in the § 1782 context." *Id.* at 99.  Under this test, "a court applies the law of the country that has the predominant or the most direct and compelling interest in whether . . . communications should remain confidential, unless that foreign law is contrary to the public policy of this forum." *Id.* (internal quotations omitted).  The country with the predominant interest is either the country where "the allegedly privileged relationship was entered into or the place in which that relationship was centered at the time the communication was sent." *Id.* (internal quotations omitted).

The documents that Scotiabank alleges are privileged under Peruvian bank secrecy principles concern the Escrow account held at Scotiabank Peru, which holds the toll revenue from the project in Peru, Scotiabank Peru's monitoring of that account, Scotiabank Peru's role in the Rutas Transaction, and Scotiabank Peru's role in running the competitive process for the sale of Odebrecht's majority stake in Rutas.  Dkt. No. 30 at 13–14.  These documents concern the relationship between a Peruvian bank and its clients and a transaction, the Rutas Transaction, that was governed by Peruvian law.  Peru thus holds the predominant interest in whether the documents at issue remain confidential.  *See In re B&C KB Holding GmbH*, 2025 WL 1802956, at *3 (S.D.N.Y. 2025) (Germany has predominant interest in allegedly privileged communications regarding transactions governed by German law); *In re BM Brazil*, 347 F.R.D. 1, 10 (S.D.N.Y. 2024) (applying English law to privileged communications that arose from English lawyers' relationship with clients and who provided advice under English law).  As the

privilege under Peruvian bank secrecy is more expansive than applicable U.S. privilege, there is no concern that applying Peruvian law would be "contrary to the public policy of this forum." *Mangouras*, 980 F.3d at 99 (citing *Astra Aktiebolag v. Andrx Pharms., Inc.*, 208 F.R.D. 92, 98 (S.D.N.Y. 2002); *cf. Astra*, 208 F.R.D. at 102 (declining to apply Korean law, which does not recognize the attorney-client privilege, because doing so would "offend[] the public policy of this forum").

Applying Peruvian law, certain of the information being sought—information concerning specific transactions, banking details, or suspicious operations reports—is privileged. Dkt. No. 30 at 2–3, 13–14. The right to bank secrecy in Peru is protected by the Peruvian Constitution and is considered a fundamental part of the right to privacy. Velarde Decl. ¶¶ 32–33. Bank secrecy, as regulated by Articles 140 to 143 of Law No. 26702, mainly protects "passive" and "active" transactions, which refers to matters such as account numbers, account balances, and account movements or funds lent out by the bank to the client. Dkt. No. 37 (Declaration of Kevin André Silva Carillo, "Carillo Decl.") ¶ 6. It does not protect banking activities that are neither deposit-taking nor lending, unless such transactions reveal protected data. *Id.* Scotiabank asserts that Peruvian bank secrecy laws would prevent it from disclosing documents concerning, for example, transactions in the Escrow Account (Request No. 2) or the monitoring, oversight, and management of the Escrow account (Request No. 3). Dkt. No. 30 at 13–14. Documents included within Request 2 and Request 3 that reveal passive banking details, active transactions, or suspicious operations reports are privileged and not subject to the subpoena. Carillo Decl. ¶¶ 13–14. A suspicious transaction report, its content, and information leading up to the filing of the report are also confidential under Peruvian law. Carillo Decl. ¶ 10; Velarde Decl. ¶¶ 33, 42. Thus, to the extent that the subpoena could be construed to call for a suspicious

activity report (SAR) or a document that would reveal the existence of a SAR,[6] Scotiabank can

withhold SARs and documents that would reveal a SAR from production.

Many of the document requests, however, are directed to material that does not fall into

the category of passive and active transactions or suspicious transaction reports and are thus not

privileged under Peruvian law.  Carillo Decl. ¶¶ 12–19.  The subpoena calls for, among others,

communications with parties involved in the competitive process run by Scotiabank,

communications with any parties involved in the due diligence process that discuss compliance,

anti-corruption measures, and transactional oversight of escrow accounts related to Rutas,

documents that outline Scotiabank's policies and procedures for monitoring escrow accounts

during due diligence, and non-SAR related complaint documents concerning potential ABC

issues involving the escrow accounts, none of which call for information about client balances,

deposits or other passive transaction details and do not involve information about loans, credit

facilities, or other active banking transactions protected by Peruvian bank secrecy.  *Id.*

While the application requests some documents that are protected by a legally applicable

privilege, that does not justify denying it wholesale.  *In re SBK ART LLC*, 2025 WL 1537474, at

*8 (S.D.N.Y. May 30, 2025) ("That some discovery sought may prove privileged does not

support an outright denial of relief."); *Mees*, 793 F.3d at 302.  To the extent that the subpoena

requests privileged information under Peruvian law, Scotiabank may decline to produce

privileged documents and prepare a privilege log of documents withheld on the basis of

privilege.  *See In re Genial Institucional Corretora de Cambio, Titulos e Valores Mobiliarios*

---

[6] The subpoena appears to avoid the SAR privilege under both Peruvian law and the Bank
Secrecy Act, 31 U.S.C. § 5318(g), because it calls for "Non-SAR related compliance documents,
and not SARs themselves or documents that would reveal the existence of a SAR."  Dkt. No.
9-5.

*S.A.*, 2025 WL 40783, at *6 (instructing parties to produce a privilege log where court did not have sufficient argument from parties to determine whether certain documents would be privileged).

### III. The Discretionary Factors Are Satisfied As to BAM and Scotiabank But Not As to Cahill

Before granting § 1782 relief, the Court must examine the *Intel* discretionary factors. The four factors set forth in *Intel* are:

> (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding,"
>
> (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance,"
>
> (3) whether "the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States," and
>
> (4) whether the requested discovery is "unduly intrusive or burdensome."

*BonSens*, 95 F.4th at 80 (quoting *Intel*, 542 U.S. at 264-65); *see Frasers Grp. PLC v. Stanley*, 95 F.4th 54, 57–58 (2d Cir. 2024) (if the "statutory requirements have been met, the district court has the discretion to grant or deny the Application").

"[T]he *Intel* factors provide a district court with a useful guide by which to assess whether to exercise its discretion to grant a section 1782 application." *In re Application of CBRE Glob. Invs. (NL) B.V.*, 2021 WL 2894721, at *9 (S.D.N.Y. July 9, 2021). Further, the factors "are not to be applied mechanically [and a] district court should also take into account any other pertinent issues arising from the facts of the particular dispute." *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 245 (2d Cir. 2018); *see also In re Genial Institucional Corretora de Cambio, Titulos e Valores Mobiliarios S.A.*, 2025 WL 40783, at *2 (stating that *Intel* factors are "'neither exhaustive nor dispositive'" and are not to be applied

mechanically (quoting *Matter of Ord. Seeking Discovery Under 28 U.S.C. § 1782*, 2024 WL

3569022, at *3 (S.D.N.Y. July 12, 2024), *report and recommendation adopted*, 24-MC-152,

ECF No. 22 (S.D.N.Y. July 29, 2024))); *Matter of Hranov*, 2024 WL 2193866, at *7 (S.D.N.Y.

May 15, 2024), *aff'd sub nom.*, *Hranov v. Deutsche Bank AG*, 2025 WL 573727 (2d Cir. Feb. 21,

2025) (considering other pertinent issues).  At the same time, however, "courts are 'not free to

read extra-statutory barriers to discovery into section 1782' under the guise of exercising their

discretion.'"  *Fed. Republic of Nigeria*, 27 F.4th at 148 (quoting *Application of Gianoli Aldunate*,

3 F.3d 54, 59 (2d Cir. 1993)).

The Court considers the arguments of each of BAM, Scotiabank, and Cahill in turn.

### A.    BAM

Peru seeks documents from BAM concerning the acquisition of the majority stake in

Rutas.  A partial list of the requested documents[7] includes:

> (1) General due diligence policies, procedures, and protocols;
>
> (2) Documents concerning any potential anti-corruption and bribery ("ABC") issues relating to Rutas, Odebrecht, or a water project in Peru for which Brookfield Infrastructure bid;
>
> (3) Documents reviewed in connection with the ABC document and compliance process review conducted in connection with the Rutas acquisition;
>
> (4) Documents concerning the findings reviewed by Brookfield prior to the consummation of the Rutas acquisition;
>
> (5) Documents concerning Brookfield's awareness of public issues in connection with the Lava Jato investigation into corruption by Odebrecht;
>
> (6) Documents and communications concerning any actual or potential corruption, bribery, money laundering, or other criminal misconduct involving Rutas, Odebrecht, or the Concession Contract that were identified or considered during the due diligence in connection with the acquisition of a majority stake in Rutas; and

---

[7] For clarity as well as brevity, the Court only summarizes certain of the requests.

(7) Documents and communications concerning any efforts by Brookfield to acquire a larger stake in Rutas after June 2016.

Dkt. No. 9-1.

The terms "Brookfield" and "You" are defined to include not just BAM but all of its affiliates, subsidiaries, and predecessors in interest including BIF III and the Brookfield Entities. *Id.* at 6.  Peru also seeks the deposition of a corporate representative of BAM to testify on issues having to do with the acquisition of the majority stake in Rutas.  Dkt. No. 9-2.  As noted, an affiliate of Brookfield named Brookfield Infrastructure acquired the majority stake in Rutas through BIF III-Peru III in 2016 after conducting due diligence.

BAM does not dispute that the second and fourth *Intel* factors would permit the Section 1782 discovery.  It does not contend that the Peruvian tribunals would be unreceptive to the discovery that Peru seeks through this Application.  While it reserves the rights to object to specific requests on grounds of burden, it does not present facts that the burdensomeness or intrusiveness of the discovery alone would prevent Peru from obtaining permission from this Court to serve a subpoena.  BAM makes only the most cursory argument that the request is burdensome or overly broad.  Dkt. No. 23 at 19.

BAM argues instead that the first *Intel* factor weighs against the Section 1782 application on the basis that the real party in interest is not BAM but BIF III, the Peruvian subsidiary which holds the majority interest in Rutas.  Dkt. No. 23 at 7, 9–14.  It also argues that the third *Intel* factor counsels against granting the application because Peru is seeking to evade United States proof-gathering restrictions related to pre-litigation discovery and obtaining discovery for use in an arbitration.  *Id.* at 12–13.  Further, it argues that the Section 1782 application should be denied as to it because the prosecutor can obtain all of the requested documents either in Peru from BIF

III or in Canada through a Mutual Legal Assistance Treaty (MLAT) proceeding from the prosecutor to the Government of Canada.  *Id.* at 11–12.

### 1.    Whether the person from whom discovery is sought is a participant in a foreign proceeding

The first *Intel* factor asks whether "the person from whom discovery is sought is a participant in the foreign proceeding."  *Intel* 542 U.S. at 264.  "The purpose of the first factor is to root out situations in which 'the need for § 1782(a) aid [] is not as apparent' because '[a] foreign tribunal has jurisdiction over' the party from whom discovery is sought 'and can itself order [that party] to produce evidence.'"  *Fed. Republic of Nigeria*, 27 F.4th at 160 n.7 (quoting *Intel*, 542 U.S. at 264).  The Court's analysis of this factor though is not limited to the question whether "the discovery target [is] a party to the foreign proceeding."  *Frasers Grp.*, 95 F.4th at 59.  Rather, the Court asks whether the applicant is, "for all intents and purposes" seeking discovery from a person who is a participant in the foreign proceeding.  *Id.* at 59 (quoting *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 85 (2d Cir. 2004)); *see In re Ativos Especiais II - Fundo de Investimento em Direitos Creditorios - NP*, 2024 WL 4169550, at *10 (S.D.N.Y. Sept. 12, 2024) ("The factor looks to substance and not form.").  A court may conclude that Section 1782 relief is not necessary if the targets of the Section 1782 application are mere "U.S.-based agents or archivists" of a person who is party to a foreign proceeding and the foreign court itself has jurisdiction to obtain the discovery requested.  *In re Saul Klein*, 2023 WL 8827847, at *11 (S.D.N.Y. Dec. 21, 2023), *aff'd sub nom.*, *Klein v. Altara RK Invs. Ltd.*, 2025 WL 560105 (2d Cir. Feb. 20, 2025).  Thus, in evaluating this factor, the issue is not limited to the formal respondent but "the real party from whom the documents are sought."  *Kiobel*, 895 F.3d at 245; *see also Matter of Hranov*, 2024 WL 2193866, at *4 ("The Second Circuit and the courts of this District have held that the first *Intel* factor weighs against an applicant who seeks

discovery from its foreign adversary through a section 1782 subpoena served upon its United States agent or affiliate").

BAM argues that the first factor weighs against Peru because (1) "the entity that acquired the majority interest in Rutas and remains as Rutas' majority shareholder is the Peruvian entity BIF III, not BAM," Dkt. No. 23 at 7, and "BIF III has been joined as a party to the preliminary investigation in Case No. 29-2023" and is providing information in connection with that investigation, *id.*; *see also* Dkt. No. 9-14.  It also claims "BAM itself does not possess any documents or information about the Rutas due diligence and acquisition."   Dkt. No. 23 at 10; Dkt. No. 24 ¶¶ 12–13.  BAM argues "[t]he fact that the *Ad Hoc* Prosecutor already has access to information from BIF III in the Peruvian criminal proceedings underscores that the application here as to BAM serves no purpose other than to harass Brookfield and improperly obtain discovery for use in U.S. and arbitral proceedings." Dkt. No. 23 at 7–8.  BAM's arguments are unavailing.

BAM's argument turns upon a faulty or incomplete premise.  It contends that Peru should be denied discovery because BIF III is a participant in a foreign proceeding.  But BIF III is a participant only in the Brookfield Money Laundering Investigation and Peru seeks the assistance of the Court in uncovering evidence not just for the Brookfield Money Laundering Investigation, but for three other proceedings: the "Villarán Bribery Case" (30-2017), the "Rutas Money Laundering Case" (31-2017), and the "Concession Contract Corruption Case" (448-2017).  Thus, even assuming the role of BIF III in the Brookfield Money Laundering Investigation would alone counsel against granting the Section 1782 request for documents for use in that proceeding, BAM's argument provides no basis for the Court to decline Peru's request for documents for use in the other three Foreign Proceedings.

Moreover, unlike the subpoenas at issue in the cases relied upon by BAM, the subpoena here does not seek "solely information" about the activities of an adverse party in the foreign proceeding. *See Matter of Hranov*, 2024 WL 2193866, at *1. It also seeks information in BAM's custody, control, and possession that relate to entities other than BIF III. *See In re Application of CBRE*, 2021 WL 2894721, at *10; Dkt. No. 24 ¶ 15 ("the due diligence for the Rutas acquisition was conducted by an international team across several Brookfield entities"). "That the information sought from [BAM] may also be in possession of [BIF III] is of little to no consequence." *In re Application of CBRE*, 2021 WL 2894721, at *10. BAM is not alleged to have the requested information "*solely* by virtue of its relationship to the real party to the foreign proceedings." *Id.*; *see also In re Evenstar Master Fund SPC for & on behalf of Evenstar Master Sub-Fund I Segregated Porftfolio,* 2021 WL 3829991, at *11 (S.D.N.Y. Aug. 27, 2021), *aff'd sub nom.*, *In re Evenstar Master Fund SPC for & on behalf of Evenstar Master Sub-Fund I Segregated Portfolio,* 2021 WL 5498283 (S.D.N.Y. Nov. 23, 2021). The Court can further ensure that the subpoena to BAM satisfies the first *Intel* discretionary factor by, as Applicant suggests, Dkt. No. 35 at 7 n.2, tailoring it and narrowing it to exclude BIF from the definition of Brookfield. *See In re Associacão dos Profissionais dos Correios,* 2024 WL 4299019, at *5–6 (S.D.N.Y. Sept. 25, 2024).[8]

BAM makes the further argument that it does not possess any document to produce because it "was not involved in (and did not exist during) the Rutas due diligence and acquisition." Dkt. No. 23 at. 2. However, under Section 1782, "[a] party need not actually

---

[8] It also would not be "surprising" if Brookfield was more responsive to discovery requests than the "entity under criminal investigation" itself. *See Fed. Republic of Nigeria*, 27 F.4th at 160 n.7.

possess material to be a properly subpoenaed party—rather, the party 'has control over material that it has the practical ability to obtain' or 'that it has a legal right to obtain.'" *In re Liverpool Ltd. P'ship*, 2021 WL 5605044, at *2 (S.D.N.Y. Nov. 24, 2021) (Nathan, J.) (quoting *In re Application of CBRE*, 2021 WL 2894721, at *3). When challenged, the burden is on the applicant to demonstrate that the target has possession, custody and control of the relevant information. *Id.*

Peru has made a sufficient showing that BAM has at least custody or control if not possession over the relevant information sufficient to permit the subpoena to issue. As an initial matter, BAM does not dispute that the requested information is within its custody or control. Its submission is narrow and carefully drawn. It asserts only that "BAM does not possess documents or information about the Rutas due diligence and acquisition." Dkt. No. 24 ¶ 13. It does not challenge that it has custody or control over such information, nor does it challenge that BAM has possession of documents concerning general due diligence policies, procedures, and protocols.

Peru has proffered facts sufficient to support the belief that BAM has "control" of the requested information. "'Control has been construed broadly by the courts as the legal right, authority, or practical ability to obtain the materials sought upon demand.'" *In re Ski Train Fire of Nov. 11, 2000 Kaprun Austria*, 2006 WL 1328259, at *5 (S.D.N.Y. May 16, 2006) (quoting *Dietrich v. Bauer,* 2000 WL 1171132, at *3 (S.D.N.Y. Aug. 16, 2000), *on reconsideration in part*, 198 F.R.D. 397 (S.D.N.Y. 2001)). "'Control' does not require 'actual physical possession of the documents at issue; rather, documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents.'" *Mirlis v. Greer*,

80 F.4th 377, 382 (2d Cir. 2023) (quoting *Coventry Cap. US LLC v. EEA Life Settlements Inc.*, 333 F.R.D. 60, 64 (S.D.N.Y. 2019)).

Brookfield Asset Management Inc. managed Brookfield's asset-management and investment functions during the Rutas acquisition. Dkt. No. 35 at 9. During the company reorganization, Brookfield Asset Management Inc. was split into Brookfield Corporation and BAM, with the asset-management and investment functions moved to Brookfield Asset Management ULC ("BAM ULC"). *Id.*; Dkt. No. 24 ¶¶ 7–9. Peru proffers that BAM has possession or control of the relevant documents, as the documents were likely moved to either BAM or BAM ULC following the reorganization, and BAM ULC is a wholly-owned subsidiary of BAM. Dkt. No. 35 at 9–10; Brookfield Asset Management Ltd. Annual Report (2024) at 16, https://www.annualreports.com/HostedData/AnnualReports/PDF/NYSE_BAM_2024.pdf

The courts in this District adopt a "pragmatic approach to understanding 'control' [which] will often result in a finding that a parent corporation has, practically speaking, sufficient control over its subsidiaries to require that it search them in compliance with a subpoena served on the parent." *Motorola Credit Corp. v. Uzan*, 2013 WL 6098388, at *3 (S.D.N.Y. Nov. 20, 2013); *see also Loc. 3621, EMS Officers Union v. City of New York*, 2024 WL 1856302, at *2 (S.D.N.Y. Apr. 26, 2024) ("Control has been construed broadly by the courts and has been found to encompass control by a parent corporation over documents held by its subsidiary") (internal quotations omitted); *Dietrich*, 2000 WL 1171132, at *4 ("Numerous courts have concluded that a parent corporation has a sufficient degree of ownership and control over a wholly-owned subsidiary that it must be deemed to have control over documents located with that subsidiary") (collecting cases). However, the parent-subsidiary relationship is not sufficient, on its own, to establish the requisite degree of control. A parent corporation with a "sufficient degree of

ownership and control . . . must be deemed to have control over documents located with [its] subsidiary." *Dietrich*, 2000 WL 1171132, at *3.  Assessing control is a fact-specific inquiry, with courts considering the degree of ownership, evidence that the entities operate as one, and demonstrated access to documents in the ordinary course of business, among other factors.  *See* 8B Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2210 (3d ed. 2025) (noting that "application of the concept [of 'control'] is often highly fact-specific."); *Eleton Holdings Inc. v. Levona Holdings Ltd.*, 2025 WL 1335511, at *2 (S.D.N.Y. May 7, 2025) (considering assertions of control, instances where parent company directed subsidiary's actions in litigation and arbitration, and parent company's role in appointing a new board of directors); *In re Ski Train Fire*, 2006 WL 1328259, at *5 (considering, *inter alia*, parent company's role in selecting subsidiary's supervisory board and involvement in planning for subsidiary).

BAM has stated in public SEC filings that it "exert[s] significant influence over" BAM ULC.  Brookfield Asset Management Ltd, Report on Form 10-K at 98 (2024).  The investment committees of BAM ULC always include the chief executive officer of BAM and BAM implements and oversees the compensation policies of BAM ULC.  Brookfield Relationship Agreement, §§ 5.2, 7.3 (Nov. 8, 2022) ("Relationship Agreement"), https://www.sec.gov/Archives/edgar/data/1937926/000119312522281144/d349441dex101.htm. Under the Relationship Agreement, "[t]he Parties acknowledge that certain officers and directors of [Brookfield Asset Management Inc.] will services as officers and directors" of that corporation, BAM and/or BAM ULC.  *Id.* § 5.1

The Relationship Agreement also reflects the intermingling of resources of BAM, BAM ULC and Brookfield Asset Management Inc.  Each entity agrees "to make its full operational

capabilities available to the other parties in accordance with any agreed upon rates or otherwise on terms consistent with past practice." *Id.* § 7.1. "The Parties agree to share the existing office space used by the Corporation and its Affiliates." *Id.* § 9.2. The agreement also gives BAM (as a shareholder of BAM ULC) "full access to [BAM ULC's] premises, assets, books, records, accounts, tax returns, contracts, commitments and records during normal business hours," including "opportunities to meet with the auditors, officers, employees, advisors or personnel of" BAM ULC. *Id.* § 5.3.1; *see Sicav v. Wang*, 2014 WL 2624753, at *6 (S.D.N.Y. June 12, 2014) (where a parent and subsidiary "shared employees, shared facilities, shared office space and utilized common practices and forms," that weighs towards finding control (quoting *In re Vivendi Universal, S.A. Sec. Litig.*, 2009 WL 8588405, at *4 (S.D.N.Y. July 10, 2009))).

Under these circumstances, it is fair to presume that if BAM wanted any of the subpoenaed documents for its business purposes, it would be able to obtain such documents from BAM ULC. Here, where the only barrier to access is the time restraint of "normal business hours," BAM has the "practical ability to possess" BAM ULC's documents. *S.E.C. v. Strauss*, 2009 WL 3459204, at *8 (S.D.N.Y. Oct. 28, 2009) ("an agreement with a third-party possessor granting a party access to documents, along with an actual mechanism for getting the documents," establishes control over those documents); *In re NTL, Inc. Sec. Litig.,* 244 F.R.D. 179, 195–96 (S.D.N.Y. 2007) (finding control where agreement provided that party could request documents from third party via phone call); *cf. Sicav*, 2014 WL 2624753, at *8 (finding no practical ability to access where obtaining information required "a cumbersome process" where the subsidiary's documents had to pass through three intermediaries before being provided to parent company). It thus follows that BAM has sufficient control over BAM ULC's documents to be subpoenaed.

### 2.    Circumvention of United States Foreign Proof-Gathering Restrictions

The third factor is "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265.  "In the context of § 1782 and the third *Intel* factor, circumvention occurs where the applicant uses a § 1782 application to avoid measures that are *intended* to restrict certain means of gathering or using evidence." *Fed. Republic of Nigeria*, 27 F.4th at 153; *see also Mees*, 793 F.3d at 303 n.20 (distinguishing between rules of the foreign jurisdiction that "*prohibit* the acquisition or use of certain materials," and rules that merely "*fail to facilitate* investigation of claims").  "'Proof-gathering restrictions' are best understood as rules akin to privileges that *prohibit* the acquisition or use of certain materials, rather than as rules that fail to *facilitate* investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information.'"  *Fed. Republic of Nigeria*, 27 F.4th at 153 (emphasis in original) (quoting *Mees*, 793 F.3d at 303 n.20).

BAM does not argue that the Section 1782 application would circumvent any foreign proof-gathering restrictions.  It argues instead that the Application circumvents United States policies on evidence gathering.  Dkt. No. 23 at 12.  In particular, BAM argues, based on the "joint" arrangement between the Ad Hoc Prosecutor and MML, that the Section 1782 Application represents an attempt to circumvent United States proof-gathering restrictions against pre-action discovery and discovery in arbitration proceedings.  Dkt. No. 23 at 3, 13–14.  BAM's argument is based on a faulty predicate.

"When discovery is nominally for use in one proceeding but evidence suggests it is in fact for use in another proceeding for which it should not be granted under Section 1782, this can weigh against granting the petition." *In re Ativos Especiais II*, 2024 WL 4169550, at *15.  Thus, where the invocation of Section 1782 is pretextual, the request is properly denied.  *See In re*

*Postalis,* 2018 WL 6725406, at *6 (S.D.N.Y. Dec. 20, 2018); *see also In re Biovail Corp. Sec. Litig.*, 247 F.R.D. 72, 75 (S.D.N.Y. 2007) ("Where the purpose of a discovery request is to gather information for use in proceedings other than the pending suit, discovery is properly denied"); *Associacão dos Profissionais dos Correios,* 2024 WL 4299019, at *6 (denying Section 1782 application where applicant had announced an intention to sue the discovery target in the United States and the broad nature of the requests suggested a continued intent to sue target in the United States).

The evidence does not support that Peru's stated reason for Section 1782 discovery is pretextual.  Peru's Deputy Ad Hoc Public Attorney for the Lava Jato Case of the Office of the Attorney General of the State of Peru has sworn that Peru seeks the information for use in the Foreign Proceedings.  She swears that Peru seeks the evidence "to support the Foreign Proceedings in which [Peru] has a significant and material interest as an aggrieved party and/or civil actor."  Caro Decl. ¶ 16.  She also explains that "[t]he requested evidence, including the due diligence materials, financial records, and banking documents, is directly relevant to proving elements of aggravated collusion, money laundering, bribery, and other criminal offenses under Peruvian law." *Id.*

BAM attempts to discredit Peru's statements based on the facts that (i) Peru has a joint defense arrangement with MML, (ii) a partner from the law firm representing both MML and Peru has stated that a conviction of MML's former Mayor would be key to undermining Brookfield's claim in the Treaty Arbitration, and (iii) Peru's delay in filing this application.  Dkt. No. 23 at 13–16.  BAM also points to statements from MML's Mayor that MML intends to file a lawsuit against Brookfield in the United States. *Id.* at 15.

Courts must "take care to demonstrate due respect . . . for any sovereign interest expressed by a foreign state." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. Of Iowa*, 482 U.S. 522, 546 (1987); Restatement (Fourth) of Foreign Relations Law § 426 (2018) (when evaluating applications under Section 1782, courts should "take into account principles of international comity regarding the legitimate interests of foreign sovereigns with respect to persons and information within their jurisdiction.").  The Government of Peru has expressed an interest in the requested discovery for use in the Peru proceedings.  BAM has not provided a basis for the Court to second-guess that stated interest.  The Ad Hoc Public Attorney has explained the timing of this application and the reason for the joint defense arrangement.  Prior to filing its Section 1782 application, MML had asked the Ad Hoc Public Attorney's Office what documents it should seek that would be useful in the Peru proceedings.  Carrion Decl. ¶ 8.  The expectation was that MML would receive the documents.  The Ad Hoc Public Attorney's Office responded and provided such information to MML before MML filed its application on November 18, 2024.  *Id.* ¶ 9.  When this Court denied MML's application, the Office of the Ad Hoc Public Attorney filed this application on behalf of the Peruvian State.  *Id.* ¶ 10.

The MML also has disavowed any intent to file a lawsuit against Brookfield in the United States.  The mayor has stated "[i]n fact, MML has not filed nor does it plan to file a lawsuit against Brookfield in the US courts."  Dkt. No. 36-4.  Finally, BAM relies on the fact that counsel for Peru and MML has stated that a conviction in Peru would have benefits in terms of the ongoing arbitration.  Dkt. No. 23 at 13–14.  But the fact that a victory in a foreign proceeding might have collateral consequences elsewhere does not establish that the request for the information is for other than use in the foreign proceeding.  Litigation often has collateral consequences.  Further, the fact that the requested discovery may also be used in actual or

contemplated domestic litigation or arbitration is not fatal to a Section 1782 application. Section 1782 "does not prevent an applicant who lawfully has obtained discovery under the statute with respect to one foreign proceeding from using the discovery elsewhere unless the district court orders otherwise." *In re Accent Delight Int'l Ltd.*, 869 F.3d at 135. Absent a court order otherwise, an applicant who obtains discovery for use in a foreign proceeding is free to use that same discovery in another proceeding, including for an action in the United States. *See id.*

### 3. Other Considerations

BAM argues that the request "is an improper attempt to obtain discovery from Brookfield's foreign affiliates through its lone U.S. entity," Dkt. No. 23 at 11, and that "relevant Brookfield entities are already cooperating to provide information about the Rutas acquisition pursuant to formal requests to Canadian authorities for international judicial assistance." *Id.* at 2, 11.

BAM's first argument sounds in *Intel* factor four: whether the request is "unduly intrusive or burdensome." *Intel Corp.*, 542 U.S. at 265. "[T]he foreign location of the documents and the foreign status of their 'primary custodian' [is properly considered] under the fourth *Intel* factor." *Banoka S.a.r.l. v. Elliott Management Corp.*, 148 F.4th 54, 70 (2d Cir. 2025). "[A] district court is not categorically barred from allowing discovery under § 1782 of evidence located abroad[, but] a court may properly, and in fact should, consider the location of documents and other evidence when deciding whether to exercise its discretion to authorize such discovery." *In re del Valle Ruiz*, 939 F.3d at 533. Thus, for example, if "'it were clear that discovery were equally available in both foreign and domestic jurisdictions, a district court might rely on this evidence to conclude that the § 1782 application was duplicative [under Rule 26].'" *Banoka*, 148 F.4th at 70 (quoting *Frasers Grp.*, 95 F.4th at 60).

BAM has not established that the request is sufficiently burdensome under Section 1782 to deny the Application. *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 284 F.R.D. 132, 135 (S.D.N.Y. 2012) ("Once relevance has been shown, it is up to the responding party to justify curtailing discovery.") (internal quotations omitted). Courts in this Circuit can and frequently do require a United States custodian to produce documents that are located abroad. *See, e.g., In re Belparts Grp., N.V.*, 2021 WL 4942134, at *4 (D. Conn. Oct. 22, 2021) ("Even if the documents sought from Belimo USA are located outside the United States, that does not mean that the European Belimo affiliates are the 'real party' in interest"); *In re Bayerische Motoren Werke AG*, 2022 WL 2817215, at *4 (S.D.N.Y. July 19, 2022) ("If the person or entity from whom discovery is sought 'resides or is found' in the district, any materials in his or its possession, even if found outside the district, may be discoverable"); *In re Evenstar Master Fund SPC*, 2021 WL 3829991, at *12 (same). Those results are consistent with the "comity" objectives of Section 1782. *See Intel Corp.*, 542 U.S. at 261–62. If a United States custodian is the repository of all or most of the documents that the applicant needs for a foreign proceeding, it would disserve Section 1782's objective in "assist[ing] foreign tribunals in obtaining relevant information" to require that applicant to go on a hunt throughout the world to compile those same materials. *Id.* at 262.

It is correct that BAM was not the entity involved in the Rutas due diligence. BAM did not exist until 2022. Dkt. No. 24 ¶ 7. But Peru has demonstrated that BAM has possession, custody, or control of relevant documents, even if located abroad, and this is not a case where the relevant evidence clearly resides with one or a few readily identifiable entities apart from BAM from which Peru could easily request production. "The due diligence for the Rutas acquisition was conducted by an international team across several Brookfield entities." Dkt. No. 24 ¶ 15;

January 2025 Vaughan Decl. ¶ 15 ("Due diligence for the Rutas acquisition was coordinated and conducted by an international diligence team comprised of individuals . . . across several Brookfield entities").  The due diligence team for the Rutas acquisition "consisted of (i) the Latin American region investment team (based in [Brookfield's] Peru, Chile and Colombia offices); (ii) the CIO of the transportation subsector; (iii) the legal team, led by the Chief Legal Officer for [Brookfield Asset Management] and the Chief Legal Officer for Brookfield Infrastructure; and (iv) senior Brookfield executives."  2021 Vaughan Decl. ¶ 31.  As a result, documents relating to due diligence are spread over a number of Brookfield entities.  Dkt. No. 24 ¶ 13.  BAM may not have been the entity involved in the transaction at issue in the Foreign Proceedings, *see Banoka*, 148 F.4th at 69, and it is undisputed that the individuals that participated in the due diligence and acquisition were employed by non-U.S. entities and operated outside of the United States, Dkt. No. 24 ¶ 15.  However, the entity that was involved in the due diligence and acquisition, Brookfield Asset Management Inc., apparently no longer exists.  Dkt. No. 24 ¶¶ 7, 12.  As part of a reorganization in 2022, Brookfield Asset Management Inc. was renamed to Brookfield Corporation and its asset management function was spun off to a new entity, Brookfield Asset Management ULC, a Canadian corporation.  Dkt. No. 24 ¶¶ 7–8.  Thus, the answer to Peru's query is not as easy as to say that Peru should make the request of Brookfield Asset Management Inc. or another identifiable entity.  Crediting BAM's allegations, if Peru did not obtain the documents from BAM, it might have to make requests to any number of entities in order to obtain them.[9]

---

[9] In support of its assertion that courts routinely deny applications brought against U.S. companies for the purpose of obtaining discovery from their foreign affiliates, BAM cites to *Hranov*, 2025 WL 573727, which concerns a subpoena targeting a party in the foreign proceeding, and cases where the court found that the company did not have control of the

While courts should consider the location of foreign documents in assessing the fourth *Intel* factor, *see del Valle Ruiz*, 939 F.3d at 533, Section 1782 authorizes production of evidence "in accordance with the Federal Rules of Civil Procedure," 28 U.S.C. § 1782(a)*,* and "it is well settled that 'discovery pursuant to the Federal Rules of Civil Procedure . . . covers materials located outside of the United States,'" *In re Hulley Enters., Ltd.*, 358 F. Supp. 3d 331, 345 (S.D.N.Y.), *aff'd*, 400 F. Supp. 3d 62 (S.D.N.Y. 2019) (quoting *Sergeeva v. Tripleton Int'l Ltd.*, 834 F.3d 1194, 1200 (11th Cir. 2016)). "The test for the production of documents is control, not location." *Id.* (quoting *Marc Rich & Co., A.G. v. United States*, 707 F.2d 663, 667 (2d Cir. 1983)). Peru has demonstrated that BAM exerts control over its subsidiary BAM ULC, and BAM has provided only cursory argument that production would be burdensome. *In re Kidd*, 2020 WL 5594122, at *11 (D. Conn. Sept. 18, 2020) ("General and conclusory objections as to relevance, overbreadth, or burden are insufficient to exclude discovery of requested information" quoting *John Wiley & Sons, Inc. v. Book Dog Books*, 298 F.R.D. 184, 186 (S.D.N.Y. 2014))). The fact that some of the requested documents may also be in the hands of BAM's foreign affiliates thus does not prevent Peru from obtaining those documents from BAM itself.

Separately, BAM argues that the Court should deny the Section 1782 request because the Peruvian prosecutors have issued official requests to Canadian authorities regarding the Rutas matter, seeking information about the Rutas due diligence and acquisition for the Brookfield Money Laundering Investigation. Dkt. No. 23 at 2, 11; Dkt. No. 24 ¶ 16. Brookfield has been

---

affiliates' documents*. Aguila Energia e Participcoes Ltda. v. JPMorgan Chase & Co.*, 2024 WL 3373416, at *4 (S.D.N.Y. July 10, 2024) (denying application where applicant failed to meet burden of establishing that parent company had possession, custody, or control of its subsidiary's documents); *In re Mun*, 2022 WL 17718815, at *3 (S.D.N.Y. Dec. 15, 2022) (same); *In re Liverpool Limited Partnership*, 2021 WL 5605044, at *3 (S.D.N.Y. Nov. 24, 2021) (same). Here, BAM has control of the relevant documents through its corporate relationship with BAM ULC.

cooperating with the public prosecutor to provide information about the Rutas due diligence and acquisition.  Dkt. No. 24 ¶ 17.  The Court takes judicial notice that there is a MLAT agreement between the Governments of Peru and of Canada.  Mutual Legal Assistance Treaty between the Government of Canada and the Government of the Republic of Peru on Legal Assistance in Criminal Matters ("Peru-Canada MLAT"), January 23, 2000, https://publications.gc.ca/collections/collection_2016/amc-gac/E3-2000-5.pdf; *see* Dkt. No. 24-1 at 8 (noting treaty).[10]

The Second Circuit has held that it is error as a matter of law for a district court to deny a Section 1782 application because the applicant can obtain the requested documents through a MLAT request.  *See Fed. Republic of Nigeria*, 27 F.4th at 157.  In *Federal Republic of Nigeria*, the court concluded that the availability of documents through a MLAT request would not deprive a foreign sovereign of the ability to obtain United States discovery under Section 1782 because the MLAT "was intended to expand, not contract," the access of each signatory party to evidence in the other's jurisdiction.  *Id.* at 154.  Under a MLAT, the executive authorities of the requested state agree to provide assistance to the requesting state's executive authorities.  *Id.* at 155.  The MLAT thus provides benefits to each of the signatory parties but also imposes limits. *Id.* at 155 ("It is hardly surprising that there should be sharper limits on borrowing the power of the Department of Justice and its law enforcement partners than on making the sorts of ordinary discovery requests available to every civil litigant in a United States District Court").  "It may . . . be that foreign sovereigns and prosecutors—both those with an MLAT and those without— often send their evidence-gathering requests to the Department of Justice instead of making

---

[10] The page numbers cited for this docket entry reference the ECF header page numbers.

applications under Section 1782," but Congress's "policy is that § 1782 applications should remain an option for the foreign sovereign." *Id.* at 156.

It follows from *Fed. Republic of Nigeria* that the fact that the fiscal may be able to request and obtain certain documents from Brookfield affiliates in Canada, while relevant to the fourth *Intel* factor re burden, cannot alone deprive the public attorney of the right to use Section 1782 to obtain relevant documents within the possession, custody and control of the Brookfield entity resident in this District. The public attorney's request does not circumvent any foreign proof-gathering restrictions. The Peru-Canada MLAT agreement serves "to improve mutual legal assistance in criminal matters," and does not preclude either sovereign from using other proof-gathering mechanisms. Peru-Canada MLAT at 2. In any event, the public attorney is not party to the request that the fiscal submitted to the Government of Canada. If the fiscal would not have been restricted from using Section 1782 as a supplementary mechanism to obtain discovery it follows *a fortiori* that the public attorney cannot be restricted from using Section 1782.

The evidence also does not establish that the Section 1782 application is duplicative or that it is otherwise burdensome in the face of the MLAT request. See *Banoka*, 148 F.4th at 61 (if discovery were "equally available in both foreign and domestic jurisdictions" a district court may find the Section 1782 application "duplicative" (quoting *Frasers*, 95 4th at 60))); *see also In re del Valle Ruiz*, 939 F.3d at 533 ("a district court is not categorically barred from allowing discovery under § 1782 of evidence located abroad"). The Second Circuit noted in *Fed. Republic of Nigeria* the limitations of MLAT requests. Because a MLAT request requires the government authority in the requested country to "affirmatively provide *assistance* to the Requesting State's executive authorities, . . . there are sharper limits [on the information that can

be obtained through a MLAT request] than on making the sorts of ordinary discovery requests available to every civil litigant in the United States District Court." *Fed. Republic of Nigeria*, 27 F.4th at 155.  The Court cannot simply presume that because the fiscal is obtaining cooperation from Canada, and through Canada the cooperation of a Brookfield entity, that the information requested in the Section 1782 request would be duplicative or the request itself superfluous. Tellingly, Brookfield makes no argument that the information requested in the Section 1782 Application is subsumed within that being provided to the fiscal under the MLAT request. Further, the fiscal's request pursuant to the Peru-Canada MLAT specifically pertains to the Brookfield Money Laundering Case, Dkt. No. 24-1 at 9, which the Court determined does not meet the "for use" requirement.  The MLAT restricts the Requesting State from using information received through an MLAT request "for purposes other than those stated in the request without the prior consent of the Central Authority of the Requested State."  Peru-Canada MLAT Art. 4.  Therefore, even if the fiscal obtained evidence relevant to the other proceedings, the fiscal could not necessarily use that evidence in those proceedings.

In addition, the public attorney for Peru is an independent person from the fiscal vested with its own separate rights under Section 1782.  As an aggrieved party, as a civil actor, and as the representative of the State, it has significant interests and rights in the foreign proceedings independent of those of the prosecutor charged with protecting the interests of society.  The Peruvian criminal system allows for participation by parties beyond prosecution and defense, including multiple parties representing the state with distinct roles and interests.  The Court cannot simply ignore the division of authority in the Peruvian government and the rights that each separate governmental entity enjoys under Peruvian law.  The Court has an obligation to respect that division of authority just as the Court would expect a Peruvian court to respect the

separate rights of different governmental actors under United States law.  *Cf. Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 444 (S.D.N.Y. 2002), *aff'd*, 346 F.3d 357 (2d Cir. 2003) ("Consistent with the spirit of mutual respect and cooperation embodied in the "comity of nations" principle, judicial proceedings in foreign tribunals touching on the laws and interests of other sovereign states should be accorded due recognition in cases where it is appropriate to do so."); *see also Ahmad v. Wigen*, 726 F. Supp. 389, 415 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990) (noting "presumption of fairness routinely accorded the criminal process of a foreign sovereign" (internal quotations omitted)).  The public attorney is a distinct advocate vested with the right under Peruvian law to submit evidence and obtain compensation should it be determined that a violation occurred.  Caro Decl. ¶¶ 9–10.  The fiscal does not seek compensation.  Section 1782, by its terms, provides that an order compelling discovery may be made pursuant to a request "by a foreign or international tribunal or upon the application of *any* interested person."  28 U.S.C. § 1782.  That the fiscal can and has made a request to Canada to obtain information from Brookfield entities in Canada thus does not necessarily limit Peru's rights to obtain discovery and to avail itself of Section 1782.  *See In re B&C KB Holding GmbH*, 2023 WL 1777326, at *5 (no requirement that a victim with procedural rights in an investigation demonstrate that prosecutors would be interested in the evidence).[11]

---

[11] At argument, counsel for Scotiabank, addressing the Court's questions to BAM, relied on the decision of the district court on remand in *Intel*.  *See Advanced Micro Devices, Inc. v. Intel Corp.*, 2004 WL 2282320 (N.D. Cal. 2004).  That decision is distinguishable.  In denying the request of Advanced Micro Devices for Section 1782 discovery, the court did not just rely on the fact that the European Commission "has jurisdiction over Intel, and therefore could simply ask Intel to produce any or all of the discovery AMD now seeks."  *Id.* at *2.  It also relied on the fact that the European Commission had stated that it did not need or want the Court's assistance in obtaining the requested documents and did not believe it necessary to review the documents, and that Advanced Micro Devices' request thus constituted an attempt to circumvent the European Commission's decision not to seek such discovery.  *Id.* at *2–3.  In this case, the prosecutor has

Finally, BAM argues that "[t]he *Ad Hoc* Prosecutor seeks essentially the same discovery as sought in *BIP*, allegedly for use in the same four Peruvian proceedings, but now names BAM as the only Brookfield entity targeted by the subpoenas."  Dkt. No. 23 at 2.[12]  This Court's decision in the Prior Proceeding is not law of the case with respect to the issue whether Peru can issue subpoenas in this case.  The law of the case doctrine "'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent states in the same case.'"  *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (quoting *Arizona v. California*, 460 U.S 605, 618 (1983)).  Assuming that Peru is party to a joint defense with MML and should be deemed to be bound by the rulings against MML in the Prior Proceedings, that proposition is of no help to BAM.  The Court denied the § 1782 request in the Prior Proceeding because it concluded that MML was not an Interested Party and that the Brookfield entities that were the subject of the subpoenas in that Court were not found in this District.  The Court did not address whether a Section 1782 request made by a proper interested person to a proper discovery subject found in this District requesting documents that would be of use in a foreign proceeding should nonetheless not be granted.  Accordingly, Peru is not precluded by the Prior Proceeding from making the request for documents in this case.

### B.    ScotiaBank

Scotiabank ran a competitive process on behalf of Odebrecht for the sale of a majority interest in Rutas.  Carrion Decl. ¶ 25.  In addition, the toll revenues from the project were to be

---

[12] not stated that it is uninterested in the documents sought by Peru.  Thus, from the record in this case, it appears that the prosecutor and the public attorney are pursuing parallel tracks to obtain the discovery each believes would be useful to the Foreign Proceedings—the prosecutor in Canada and the public attorney through the request here.

[12] Scotiabank also argues that it is improper for the Ad Hoc Attorney, represented by the same lawyers who represented MML, to seek the same discovery that MML sought but was not able to obtain.  Dkt. No. 30 at 1–2.

held in an escrow account monitored by Scotiabank. *Id.* ¶ 42. Peru seeks the following

documents, among others, from Scotiabank:

(1) Communications with any parties involved in the competitive process run by Scotiabank;

(2) Communications with any parties involved in the due diligence process that discuss the monitoring, oversight, or management of escrow accounts related to Rutas;

(3) Documents concerning transactions in the escrow accounts monitored by Scotiabank

(4) Communications with any parties involved in the due diligence process that discuss the monitoring, oversight, or management of escrow accounts related to Rutas;

(5) Documents that outline Scotiabank's policies, procedures, or internal guidelines for monitoring escrow accounts during due diligence, including any protocols for identify or reporting suspicious transactions;

(6) Non-SAR related compliance documents concerning any potential ABC issues involving the escrow accounts related to Rutas during the due diligence process;

(7) Documents sufficient to identify the payments made to or from Rutas, Brookfield, or Odebrecht, including but not limited to payments made to or from the account accounts related to Rutas involving third parties, government officials, or agents as part of Rutas's transactions; and

(8) Communications with regulatory or governmental authorities related to the monitoring of escrow accounts related to Rutas.

Dkt. No. 9-5. "Scotiabank" and "You" are defined to mean The Bank of Nova Scotia, Scotia

Capital (USA) Inc., and Scotia Holdings (USA) LLC and persons acting on behalf of them. *Id.*

at 2.[13]

Scotiabank makes a series of overlapping arguments. It contends that (1) the Subpoena

improperly seeks information subject to the privilege for suspicious activity reports or protected

by Peruvian principles of bank secrecy, Dkt. No. 30 at 12–15; (2) the first *Intel* factor weighs

against the application because the information being sought is within the jurisdiction of the

---

[13] The page numbers cited for this docket entry reference the ECF header page numbers.

Peruvian courts, *id.* at 16–19; (3) the third *Intel* factor weighs against the application because the subpoena circumvents Peruvian principles and procedures with respect to bank secrecy, *id.* at 19–21; and (4) the fourth *Intel* factor weighs against the application because the subpoena is unduly intrusive and burdensome, *id.* at 22–25. Scotiabank also argues that the application should be denied because it is successive, and in bad faith, and seeks documents for the arbitrations Brookfield's affiliates have filed against MML and Peru.[14] *Id.* at 10–12. Scotiabank's arguments regarding the bank secrecy privilege, and in turn the third *Intel* factor, were addressed above, when the Court determined that some of the requested documents are protected by a legally applicable privilege.

### 1. Intel Factor 1: Whether the person from whom discovery is sought is a participant in a foreign proceeding

Scotiabank argues that the first *Intel* factor weighs against the application because the information that Peru seeks can be obtained by the Peruvian prosecutors in the Peruvian proceedings without violating Peruvian or United States law. Dkt. No. 30 at 18. In particular, the preparatory investigation judge, at the request of the prosecutor, may order the lifting of bank secrecy restrictions when necessary for a specific case. Velarde Decl. ¶¶ 37–38. That argument is without merit.

As previously discussed, United States courts frown on requests to a United States resident for the production of documents that are in the possession of the foreign affiliate that is a party to the foreign proceeding and where the documents relate to the conduct of that foreign affiliate. *Matter of Hranov*, 2024 WL 2193866, at *4; *Kiobel*, 895 F.3d at 245; *Effecten-Spiegel*

---

[14] Scotiabank also argues that Peru wishes to use the requested information only in connection with the recently commenced ICSID arbitration. Dkt. No. 30 at 11–12. The Court has addressed and rejected that same claim in connection with the arguments of BAM. Assuming that the requested discovery is of use in a qualified foreign proceeding, it is irrelevant that it might have some value in another proceeding.

*AG v. Lynch*, 771 F. App'x 38, 39 (2d Cir. 2019) ("the District Court was entitled to consider the possibility that much of the requested discovery could be obtained from Porsche, a party to the German litigation") (summary order). "[W]hen the person from whom discovery is sought is a participant in the foreign proceeding, the need for § 1782(a) aid is not as apparent as it ordinarily is when the evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264. Moreover, it is not necessary that the discovery target itself be a party to the foreign proceeding. It is sufficient that target is only a custodian and that the real party in interest is a participant. *See In re Ativos Especiais II*, 2024 WL 4169550, at *10; *In re Saul Klein*, 2023 WL 8827847, at *11.

Neither Scotiabank nor any of its affiliates is a party to or a participant in the Foreign Proceedings. Dkt. No. 30 at 18. Scotiabank's argument, rather, rests on the premise that because the documents requested by Peru are in the possession of Scotiabank-Peru and because they can be obtained by the fiscal in the Foreign Proceedings from Scotiabank-Peru, they should be deemed to be in the possession of a party to the Foreign Proceedings. Dkt. No. 30 at 17. In essence, they argue that the prosecutor is the party with possession, custody and control over the subpoenaed documents.

It is settled law in this Circuit, as well as in others, that an applicant does not need to seek documents through the foreign tribunal before it seeks the assistance of a United States court in obtaining those same documents from a person who is found in the District. *See Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1098 (2d Cir. 1995); *In re Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992)); *see also SPS Corp I, Fundo de Investimento em Direitos Creditorios Nao Padronizados v. Gen. Motors Co.*, 110 F.4th 586, 592 (3d Cir. 2024); *John Deere Ltd. v. Sperry Corp.*, 754 F.2d 132, 136 (3d Cir. 1985). The Second Circuit has repeatedly

rejected the argument that a person can seek discovery under Section 1782 only after it has "first tried and failed to obtain the discovery" in the courts in which it hopes to use that discovery, concluding that "such a 'quasi-exhaustion' requirement, . . . 'finds no support in the plain language of the statute and runs counter to its express purposes.'" *Mees*, 793 F.3d at 303 (quoting *Metallgesellschaft,* 121 F.3d at 79); *see also Fed. Republic of Nigeria*, 27 F.4th at 156. Thus, the claim that the public prosecutor could obtain some or all of the requested documents from Scotiabank's Peruvian affiliate in Peru does not mean that Peru cannot, through the public attorney, seek the documents from Scotiabank in the United States. To hold otherwise would be for this Court to apply an exhaustion of alternative remedies requirement that the Second Circuit has consistently rejected. Moreover, it would have the Court do so without any evidence that "*all* the requested documents are available in Peru," Dkt. No. 35 at 12, or that if they were in Peru, they would be produced.

Indeed, Scotiabank's argument is even further afield. Peru has independent rights to those of the fiscal. Caro Decl. ¶¶ 7–8 (distinguishing the role of the Prosecutor's Office and Office of Attorney General of the State in criminal proceedings), ¶¶ 12–15. As an aggrieved party and as a victim, Peru has significant procedural rights, including the right to challenge the fiscal's decision to discontinue the investigation, the right to challenge an acquittal, and the right to submit evidence. *Id.* ¶ 9. And as a civil actor, it has the additional right to seek recompensation or money damages—relief not available to the fiscales. *Id.* ¶ 10. It would undermine rather than support the Peruvian system for this Court to hold, on this record, that because the fiscal can seek documents from Scotiabank-Peru (which is not a party to any proceeding below), Peru—which has no ability to seek the same documents in Peru—should be deprived of its remedies in the United States under Section 1782.

Scotiabank relies upon this Court's prior decision in *In re Ativos Especiais II*, 2024 WL 4169550, and Judge Rochon's decision in *In re Adriana Embiricos Coumoundouros*, 2025 WL 1446876, at *5 (S.D.N.Y. May 20, 2025). But those decisions lend Scotiabank little support. In *Ativos*, the Court found that *Intel* factor 1 weighed against the application and granted the motion to vacate the Section 1782 order because the "vast majority of the information" which the applicant sought was available from persons who were parties to the foreign proceedings in which the applicant sought to use the information. 2024 WL 4169550, at *12. That is not the case here. *Adriana Embiricos Coumoundouros*, 2025 WL 1446876, involved a request for documents that were not in the possession of a participant in the foreign proceeding but that were within the foreign tribunal's jurisdictional reach. *Id.* at *5. The court did not find that those facts weighed against granting the application but that they were "at best neutral." *Id.*[15]

### 2.    Intel Factor Four Whether the Subpoena Is Unduly Burdensome

Finally, Scotiabank argues that the compliance with the subpoena would be unduly burdensome in part because many of the documents are located in Peru and because disclosure of the information allegedly would subject Scotiabank Peru and Scotiabank US to potential criminal and civil penalties. Dkt. No. 30 at 3. Scotiabank also argues that MML can get access to the account documents for the Escrow Account as a party to the Collection Trust Agreement with Scotiabank Peru and Rutas and that, accordingly, Peru should be denied Section 1782 assistance because it can get the same documents through MML by virtue of its joint defense arrangement

---

[15] The court denied the Section 1782 application in *Adriana Embiricos Coumoundouros*, because it did not satisfy the statutory requirements, *id.* at *5, and because the evidence suggested that the application was filed in bad faith and constituted a fishing expedition, *id.* at *6. In *In re RSM Prod. Corp.*, 2018 WL 1229705, at *3–4 (S.D.N.Y. Mar. 9, 2018), the court did give weight to the fact that the documents at issue were within the jurisdiction of the foreign tribunal, but also found that the target of the subpoena was not found within the district and that the application was vexatious and made in bad faith.

with that entity.  Dkt. No. 30 at 1–2, 5.   The Collection Trust Agreement among Rutas, MML, and Scotiabank Peru dated February 7, 2013 gives MML the right to receive account statements, quarterly financial statements, annual reports and quarterly action reports related to the escrow account.  Velarde Decl. ¶ 48 & ex. 5.

The Court can deny a Section 1782 application when "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."  *Frasers Grp.*, 95 F.4th at 60 (quoting Fed. R. Civ. P. 26(b)(2)(C)(i)).  The Court will not deny the Application on the basis that it is unreasonably cumulative or duplicative.  Many of the requests go beyond the financial statements and reports that apparently would be available to MML under the Collection Trust Agreement, including communications with parties involved in the due diligence process and documentation of policies and internal guidelines.  Dkt. No. 9-5.  Scotiabank has also not demonstrated that the documents that Peru seeks are uniquely located in Peru or that Scotiabank-Peru would make them available to the public attorney or the fiscal in Peru.  And, even if certain documents were available to the fiscal, that would not necessarily satisfy the public attorney's independent interest in the documents.  Scotiabank also does not dispute that the requested documents are within its custody and control.  Dkt. No. 35 at 12; *In re Application of Bloomfield Investment Resources Corp.*, 315 F.R.D. 165, 168 (S.D.N.Y. 2016) (finding respondents did not establish undue burden where they "point to no specific subpoenaed documents over which they lack control" and do not "present particularized evidence . . . that production . . . would be unduly burdensome or costly").

Moreover, the subpoena is limited to the time period January 1, 2016 to December 31, 2016, Dkt. No. 9-5 at 7, and many of the requests appear to be narrowly tailored to

communications with parties involved in the due diligence process or the "competitive process" or communications with regulatory or governmental authorities or to policies and procedures. Dkt. No. 9-5.  To the extent that certain of the requests, such as that for documents concerning transactions in the escrow accounts monitored by Scotiabank, are not sufficiently narrow by virtue of the time period, Scotiabank can move to limits its scope under Rule 45 after attempting to meet and confer with Peru.  *See Matter of Application for an Order Seeking Discovery Under 28 U.S.C. § 1782*, 2024 WL 2883293, at \*9 (S.D.N.Y. May 16, 2024), *report and recommendation adopted by*, 2024 WL 2883091 (S.D.N.Y. June 5, 2024); *In re Ulmans*, 2023 WL 3853703, at \*6 (S.D.N.Y. Apr. 20, 2023), *report and recommendation adopted by*, 2023 WL 3412769 (S.D.N.Y. May 12, 2023).[16]

### C.    Cahill

Peru seeks the following from Cahill:

(1) Documents concerning any potential ABC issues relating to Rutas, Odebrecht, the "Olmos water project," and the company "BRK Ambienal";

(2) Documents reviewed in connection with the ABC document and compliance review;

(3) Documents concerning Cahill's factual findings in due diligence;

(4) Documents concerning Brookfield's awareness of the public issues in connection to the Lava Jato investigation;

(5) Documents sufficient to identify all persons involved in the due diligence in connection with the acquisition of a majority stake in Rutas;

(6) Documents and communications concerning any actual or potential corruption, bribery, money laundering, or other criminal conduct involving Rutas, Odebrecht, or the Concession Contract that were identified or considered during the due diligence in connection with the acquisition of a majority stake in Rutas; and

---

[16] In addition, Scotiabank need not produce documents covered by Peruvian bank secrecy or the Peruvian SAR privilege.

(7) Documents concerning Brookfield's decision to move forward with acquiring a majority stake in Rutas in light of the factual findings reported in the due diligence and Brookfield's awareness of the Lava Jato investigation.

Dkt. No. 9-3.

Cahill was retained by Brookfield to perform the Rutas due diligence.  January 2025 Vaughan Decl. ¶ 16.  None of the meetings between BIP and Cahill regarding that due diligence took place in New York or elsewhere in the United States.  *Id.*

Cahill joins in Parts I, II.A, II.C, and III of BAM's argument.  Dkt. No. 33 at 1.  Those arguments include that the Brookfield Money Laundering Investigation is not an applicable foreign proceeding, that the real party in interest is BIF III and that the request should be denied because BIF III is cooperating with the Peruvian authorities and Brookfield is cooperating with the Canadian authorities, and that Peru has improper purposes for the evidence.  Dkt. No. 23 at ii. The Court's rulings apply equally to Cahill.

Cahill also argues that the request should be denied on authority of *Kiobel* and *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 70 (2d Cir. 2003) and *In re  Application of Hulley Enters. Ltd.*, 400 F. Supp. 3d 62, 75 (S.D.N.Y. 2019)   Dkt. No. 33 at 2 & n.3.

Cahill's argument has merit and the Section 1782 request with respect to Cahill is denied without prejudice.  A court must proceed with care before granting a Section 1782 request directed to a law firm for communications between the firm and its clients.  *See Kiobel*, 895 F.3d at 247; *Friedman*, 350 F.3d at 70; *cf. Liner Freedman Taitelman Cooley, LLP v. Lively*, 2025 WL 2205973, at *4 (S.D.N.Y. Aug. 4, 2025) ("a court must take special care in evaluating subpoenas directed to opposing counsel").  "The Supreme Court has stressed the need for 'full and frank communication between attorneys and their clients,' which 'promote[s] broader public interests in the observance of law and administration of justice.'"  *Kiobel*, 895 F.3d at 247

(quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389  (1981)).  That communication would be chilled if documents not otherwise discoverable were made subject to discovery because they were shared with counsel in the course of seeking legal advice.  "If foreign clients have reason to fear disclosing all pertinent documents to U.S. counsel, the likely results are bad legal advice to the client, and harm to our system of litigation."  *Id.*

In *Kiobel*, the applicant sought documents from New York counsel to Royal Dutch Shell ("Shell") counsel that counsel held because it represented Shell in prior litigation brought by the plaintiff against Shell in New York.  The applicant sought the same documents for the purpose of suing Shell in the Netherlands.  The applicant would not have been able to obtain the documents under "the Netherlands' more restrictive discovery practices."  *Id.* at 245 & 245 n.3.  The court held that the Section 1782 application should have been denied because "the real party from whom documents are sought (here, Shell) [wa]s involved in [the] foreign proceedings," *id.* at 245, and by seeking the documents from counsel rather than from Shell, the plaintiff was attempting to "bypass Dutch discovery restrictions," *id.* at 245 n.3; *see also In re Hulley Enters. Ltd.*, 400 F. Supp. 3d at 75 (applying *Kiobel* to documents given to U.S. law firm by Russian client).

This case admittedly is not on all fours with *Kiobel*.  Peru seeks documents that are not in the possession of a person who is already a party to qualifying foreign proceedings and thus no claim can be made that Peru is seeking to bypass Peruvian discovery restrictions.  But the same concerns that argued for caution in *Kiobel* also argue for caution here.  The documents Peru seeks from Cahill are in its possession solely because of its representation of Brookfield.  If United States law firms became the first stop for discovery requests under Section 1782, "U.S. law firms with foreign clients [might] be forced to store documents and servers abroad, which

would result in excessive costs to law firms and clients.  Alternatively, U.S. law firms [might] have to return documents to foreign clients (or destroy them) as soon as litigation concludes." *Kiobel*, 895 F.3d at 247.  The result would be undermining to the rule of law.  Because "law firms have an interest in retaining documents where needed to protect themselves from accusations of wrongful conduct[,] U.S. law firms may be harmed if they must destroy or return a foreign client's documents as soon as possible once a proceeding is completed."  *Id.* at 247–48. More concerning, "foreign entities may simply be less willing to engage with U.S. law firms." *Id.* at 248.  In addition, "[a] deposition or document request directed to counsel may encroach on the attorney-client privilege or attorney work product doctrine.  Beyond that, a discovery request to counsel can threaten to turn the lawyer into a witness against the client and thereby may burden a party's choice of counsel."  *Liner Freedman Taitelman Cooley, LLP*, 2025 WL 2205973, at *4.

For those reasons, the Section 1782 Application is denied as to Cahill without prejudice. Peru is seeking documents from Cahill here that it also is seeking from BAM.  The motion may be renewed if Peru can proffer reason to believe that Cahill has responsive non-privileged documents in its possession, custody and control that are not produced by BAM.

**CONCLUSION**

The Application is GRANTED as to BAM, KPMG, Scotiabank, Arup Latin America S.A., Arup Americas, Inc., Citibank, N.A., Wells Fargo, N.A., JP Morgan Chase & Co., CHIPS, and Fed-NY. The Application is DENIED as to Cahill.

Petitioner is authorized to serve KPMG, Scotiabank, Arup Latin America S.A., Arup Americas, Inc., Citibank, N.A., Wells Fargo, N.A., JP Morgan Chase & Co., CHIPS, and Fed-NY with the subpoenas. Petitioner is authorized to serve BAM with the subpoena, as modified to exclude BIF from the definition of Brookfield.

The Clerk of Court is respectfully directed to close Dkt. No. 1.

SO ORDERED.

Dated: November 18, 2025
      New York, New York                                    _____
                                         LEWIS J. LIMAN
                                United States District Judge